All right, I'm leading off, Mr. Stefani. You've got some, you know, fairly sort of narrow time allocation, so if you would just spot us, A, that we've read the briefs and, you know, the rather complex facts scenario, et cetera, et cetera, so at least you get the best push out of your eight minutes on the core issues that we might get tangled with. Yes, Your Honor. My name is Bob Stefani. I'm here for Comar Marine, LLC, and, in fact, on your point, due to the time limitations, I'm going to focus really on two issues, the issue of whether Comar has a maritime lien for damages arising from breach of these agreements and whether Comar had probable cause to arrest the vessel. And, well, I'll rely on my briefs for the other issues, but, of course, I'll stand ready to address any questions you might have. The district court in this case ruled that the vessel owners breached the vessel management agreements by terminating them before the end of their term, and the court awarded Comar damages. Now, the court didn't award the liquidated damages that we were asking for but awarded damages based on what the minimum management fee that Comar would have made over the life of the contract. Now there's no dispute that these vessel management and operating agreements are maritime contracts. It wasn't disputed at the trial court. There's several cases that we've cited in our brief to that effect regarding vessel management and operating agreements. What the court said is that maritime liens are strict de jure, they're strictly construed, and since there's no statute or case holding that a vessel management and operating agreement such as this gives rise to a maritime lien if it's breached, they just declined to so hold. But this is a really doctrinaire approach and ignores the nature of this agreement and the nature of the damages that were suffered by Comar. This is an agreement which confers exclusive and complete operational control over this vessel, and actually there are four of them, but the agreements are identical, to Comar. And it confers that for a term, a stated term of three years, and what Comar does is it usually oil companies or companies engaged in drilling operations, Comar's responsible for collecting the charter hire that it earns and making sure that the vessel has absolutely everything it needs to operate. It has to provide the crew, it has to provide all supplies it needs, all repairs, all maintenance, it has to insure it, and it has to make sure they have fuel, food, everything they need. And in this sense, the exclusive operational control and the fact that they're providing all of the necessaries that are needed for this vessel to operate really brings this agreement for purposes of this inquiry into the ambit of rules governing bare boat charters. Because that's what happens in a bare boat charter. The vessel owner turns a vessel over to the bare boat charter, the bare boat charter operates it as what they call owner pro hack viche, does everything that Comar does in this case. And the very aspect of this agreement that was breached, that the court found was breached, was Comar's right to exclusive control. And that's what brings it, as I said, into those cases which are cited in our brief, international marine towing, rainbow line, East Inc., that hold that a breach of a bare boat charter. The court, the district court in this case, basically didn't feel that they had authority to go beyond the existing principles in those cases, and they basically said, this case, this agreement is not a bare boat charter, and therefore, we are not going to extend the rule to it. But the Supreme Court has said that even though maritime liens are strict de jures, courts have authority to extend maritime liens when doing so falls within accepted supporting principles, even when those circumstances are unusual or infrequent. And we submit that this is such a case. And there's actually numerous cases where courts, as a matter of first impression, are deciding that a party gets a maritime lien. The international marine towing case, in that case, this court said there's no direct prior authority for the proposition that a bare boat charter had a right to assert a maritime lien, but the court nonetheless did so. The same was true in East Inc. So we believe that these authorities support a finding that there is a maritime lien in this case. It seems to run counter to the premise you started with, and that is, with liens in particular, in general, and maritime lien, that they're strict de jure, so it seems to run counter to the notion of being strictly construed to say that there's a broad interpretation of when one exists, particularly in the absence of some explicit language or agreement, etc., to that notion. I mean, I heard what you just said in terms of the case. I'm just saying to me that runs counter to sort of a hornbook notion about liens and security rights and interests, which typically, you know, are derived very explicitly. So to be kind of overlaying the kind of charter, etc., into another milieu to say, well, this gives rise to that, just maybe you're right, but I'm just having trouble digesting that. Well, Your Honor, I would point out a couple things. First of all, in this agreement, there was an express acknowledgment that Comar was relying on the credit of the vessel for all amounts that it would earn under this agreement, for all activities relating to the agreement, and that it was entitled to a maritime lien to secure those amounts. There's an express provision, Article 16 of the agreement, that says that. And it is true that the maritime liens are strict de jures, but that doesn't mean that the universe of maritime liens is now fixed forever. There are going to be agreements that come along in the future that courts will have to consider, just as they did when bare-boat charters were first presented, to decide whether a party has a maritime lien. And what we're saying is that the damages that flow from this, this is an agreement that pertains very focused on the operation of a vessel by Comar. And the damages that flow from that came directly from the breach of that obligation. What's the best case you have for the construction of an agreement like this equaling a bare-boat charter scenario and the determination of the existence of a maritime lien? Well, I think the international marine towing case, which actually dealt with the bare-boat charters, is a case to that effect. And I also think the Supreme Court's case in Kraus, Brothers Lumber, which I mentioned, is a case that basically states the rule that this court has the authority to extend that rule to other types of agreement, even though it's never seen them before. All right. Your Honor, I have limited time at this point, and what I would like to do, if I can, on rebuttal, is the opportunity to address some of these other issues. I only have two minutes there, but I would request the Court's indulgence on that. Tell you what, hopefully my colleagues won't object. I'm going to be gratuitous. I'm going to give you, I want to give you three more minutes to make whatever the other point. And if I need to equalize it, I will. It's a big case. Lots at stake. And if more time is needed over there, we'll equalize it out. But I want to make sure everybody's argument is out here so we know what to do. So you've got three. Thank you, Your Honor. Not 301. I understand. Thank you, Your Honor. The second issue I'd like to address is the Court's determination on wrongful, bad-faith arrest. The Court erred in this, and it did so due to a misreading of the contract and a misapplication of the law. What the Court said was Comar, at the time that it arrested these vessels, had advanced funds and had provided necessaries to the vessels that were outstanding. It had made loans to pay for necessaries provided to the vessel. And it also had a claim for damages, which were ultimately awarded. The Court read the contract and somehow, and it's inexplicable because it's nowhere in the contract, took the position that Comar was obligated to offset against these amounts outstanding accounts receivable and amounts due from charters. They hadn't been paid yet, but from the Court's perspective, those amounts had to be credited at the time of arrest, even though they hadn't been collected. And I submit, and I detailed it in our brief, that that is actually contrary to what the Court says. Comar didn't have any obligation to offset those amounts. Now, those amounts were certainly disputed. They were disputed at trial, and essentially, they continue to be disputed by the vessel parties contending that they should have been offset by these accounts receivable. But the fact that those amounts were incurred is not disputed. In other words, the amount may be in dispute, but there's no dispute that Comar was owed amounts for necessaries at the time of the arrest. And under the case law we've cited in our brief, that is enough to establish a prima facie case of a maritime lien. And in fact, there's a couple of cases in particular. There's a case, Canton Port Services, that we cited, which says that the right to arrest is not dependent on invoicing. The right to arrest arises when the necessaries are provided to the vessel, exactly when they're provided to the vessel. There's no dispute that Comar had done that and that Comar was owed amounts for that at the time that it arrested the vessel. So it was improper for the court to say, well, you were in bad faith because you failed to invoice. There's also case law that we cited that even though the amount is in dispute, even though the amount is in dispute, you still have a maritime lien if it's undisputed that some amount is owed. And that is the case here. In fact, counsel for the vessel parties at trial presented a table that said, well, only this amount is owed. But clearly that amount was a positive number. And lastly, I would just say that, again, in this case, Comar relied on its contract, which said that it had a maritime lien. Now, clearly all these issues are hotly disputed, but Comar was relying on that contract or at least a good faith extension of the law, and there's case law again cited on our brief, that when it does so, it doesn't act in bad faith. It has probable cause to arrest the vessel under those circumstances. All right. Thank you, sir. Mr. Hatton. Good morning, Your Honors. May it please the court, Chris Hatton for what's been defined as the vessel parties. That's Chris Sanamon, Tracy Liret, and the four vessel-owning LLCs, Marauder, Conqueror, Raider, and Enforcer Marine Logistics. Again, limited time, Your Honor, so I'm just going to try and jump right into it. First, I feel compelled, even though the banks are going to be responding in bulk to the lien issues, I feel compelled to say that the jurisprudence is pretty resounding that you can't extend maritime liens by analogy. And it also says that if you don't have a case supporting that you have a maritime lien based on your facts, that's, quote, damning to the claim. So precisely what they're trying to do in this case is extend a lien by analogy. And on top of that, the analogy just doesn't hold water. They're trying to say this was like a bareboat charter. In a bareboat charter, the charterer pays the owner. Here the owner was paying the person who was operating the vessel. It's a fundamentally different contractual situation. And the court asked about the best case about trying to analogize this to something else. We would submit that the best case is Judge Zaney's decision in the Vizier case out of the Eastern District, which was precisely the same type of vessel management agreement, and no lien was found as to the vessel management aspects of that agreement. To go to the wrongful arrest issue, we would submit that in numerous places throughout the contract, there is a requirement for AR offsets. But before getting to those, the place where it's specific is in the termination provision at Article 8F of the contract, which requires that Comar has to provide a good-faith estimate to the vessel owners at termination. The district court below made numerous extensive findings of fact that are subject to clear error deferential review as to the bad faith of Comar in that they didn't have probable cause, they arrested the vessels in bad faith, and they did it with malice. Article 8F requires a good-faith estimate. The only way you can have a good-faith estimate is if you take into account monies that are going to be owed down the line to the people that you're trying to arrest the property of. And as it turned out at trial, this is Trial Exhibit 300, Comar owned calculations. It turned out that they owed the vessel parties $21,000 as to the owner expense portion of their lien claims. So after the dust settled, they actually owed us money for the owner expense portion of the claims that they relied on to arrest our vessels. Now as to the termination fee portion of their lien claim, and just to back up for a second, there was basically two categories that underlay their arrest claims, the owner expense issue and the termination fee issue. The termination fees are fundamentally as a matter of law non-lienable because they do not relate to any services provided to the vessels. These termination fees were for periods after the termination of the contract when Comar would be providing no vessel services at all. So as a fundamental matter of law from the get-go, you can't get a lien for those types of damages. So again, as it turned out, none of the claims underlying their arrest claims initially that started this case had any merit at the time of the arrest. And frankly, Your Honors, the reason that we're here today, the reason everyone in the room is here today is because of the wrongful arrest. That's what started this whole ball rolling down the hill. Had it not been for the wrongful arrest, I'd submit that none of us would be in the room today. With that kind of high-level background, I'm going to jump into what are the two most prominent issues for the vessel parties, first of which is the district court's denial of lost profits damages resulting from the wrongful arrest. First and foremost, the district court's opinion, we would submit, is facially contradictory on its own terms. At paragraph 198 of the court's reasons for rulings, this is at page 5030 of the record, the court found as follows. The court finds that Comar's wrongful arrest of the vessels caused the vessel parties damages in the form of lost charter hire. And then it goes on to point out the number of days each vessel was under arrest. Elsewhere in the opinion, however, paragraph 167, this is at 5027 of the record, the court says, Owners have failed to introduce any evidence to allow the court to find with reasonable certainty that the arrest of the vessels caused actual damages. So in one place, the court says, finds, as a matter of law and the conclusions of law, that there was causation of lost charter hire damages. But elsewhere he says that there wasn't. That, we would submit, is contradictory on its face and needs to be rectified. And dovetailing off of that contradiction, the law of lost profits says where damage, including lost profits and liability, are certain and quantum is uncertain, courts are nonetheless required to award damages. That's a Louisiana case, Foles v. Red Arrow Tow Bar Sales, and this court has recognized the same principle under maritime law in Texas Company v. Pensacola Marine Corps. So not only is there a contradiction in the underlying ruling with respect to the damage issue, to the extent there's a finding that there were damages, the court was required to grant those. In addition, Your Honors, and this is a separate issue from the contradiction, the court's denial of damages for lost profits appears to have been based on the concept that you have to provide evidence of a specific lost opportunity to get damages in this context. That's simply not the law of this court. There's myriad jurisprudence in the maritime decisions from this court that all you need is evidence of an active ready market for the vessel or a steady demand in the market. In fact, this court has said a plaintiff seeking detention damages need not prove a specific lost opportunity. That's the MV Takeo Invader case. Additionally, this court has said that to require the vessel owner to prove that specific, in this instance, cargos were not carried because of the casualty, would be unsound because it would place an onerous burden not called for in this type of case. And that quote, we would submit, Your Honor, that's from the Delta SS Lines case. That's particularly fitting in this circumstance because everyone in this case admitted, there was testimony to this effect at trial, that this industry, the chartering of crew boats and offshore supply vessels is a very ad hoc industry. You could get or lose a charter in five minutes over the phone. So the concept that you have to be able to provide some specific lost charter, in addition to not being consistent with this court's rulings, is just not practical. And to follow up on that, there's been numerous cases where lost profits damages have been granted in similar cases. Most prominently, State Bank and Trust of Golden Meadow versus Boat DJ Griffin. That was a wrongful arrest case where a boat was wrongfully arrested and then sold improperly, and the court awarded both lost equity damages, which I'm going to get to in a second for our case, as well as lost profits. And the basis for the lost profits damage in that case was the boat that had been wrongfully arrested and sold had been operating under a charter agreement for about four years prior to the wrongful arrest. So what the court did was it extrapolated that single charter hire contract day rate out over the remaining life of the wrongfully arrested and sold vessel. If one contract in that case was sufficient to award lost profits, we would submit that the evidence in this case below, which was summaries of utilizations and day rates for months prior to the wrongful arrest that was prepared by Comar, is likewise sufficient and adequate to support a lost profits award. Additionally, to move to lost equity briefly, the district court held squarely that the wrongful arrest of the vessels quote, forced the vessel parties to place the three chase finance boats into bankruptcy. And yet there was no award for damages resulting from the lost equity in those boats, which were eventually sold out of the bankruptcy. And to put it in context. You make it sound all so clear. How did the district court miss all that? Frankly, Your Honor, we're not sure. Particularly with respect to the lost profits because of the contradiction, we're not sure how the district court missed it. And with respect to lost equity, again, there was evidence in the record as to the value of those vessels at the time of the arrest and at the time they were sold. And we would submit that the values of those vessels at the bankruptcy sale is the proper quantum for the lost equity piece. And again, the first domino in all this, the sine qua non from which this whole case stems, is the wrongful arrest. But for that, there would have never been a bankruptcy. Frankly, again, we wouldn't be here. If I could move quickly to the personal guarantee issue. We believe the district court improperly found that Mr. Tracy Lederich and Chris Sanamon personally guaranteed these agreements. And we believe that it's contrary to the applicable Louisiana law. Basically, what the court's ruling held was that the word guarantor next to the line in the signature block is sufficiently clear, expressed, and unambiguous to make that person a guarantor. The problem there is there was a whole separate provision in the actual body of the contract describing who and how the guarantee provisions were going to be enforced. We would submit that you can't just take a word next to a signature line and say that that's a clear and express- What did it mean? Well, Your Honor, we would submit it meant what the Article 20, which is the contractual body provision for guarantees, said, which is the principle of the owner is the guarantor of the agreement. These vessel LLCs were all single-member LLCs, and the single member was Gator Offshore LLC. That's the principle of the owner. The only member of the vessel-owning LLC was Gator Offshore, not these two individuals. They were not parties to- Why are they signing as guarantors? They were signing as representatives of Gator Offshore, which is the only principle of the vessel-owning entity. That would be our submission. And in any event, the bottom line here is these questions underline the point. This is an ambiguous provision. You can't have a personal surety ship, a personal guarantee based on ambiguity. And the proof of the pudding, Your Honor, is other vessel agreements that Comar entered into with other owners did make it clear and express. This is at, I believe it was tab 13 of our record excerpts. These other agreements specifically said in the signature block, it's guarantor, referring to the party above, principle of owner, guarantor of this agreement. So it was clear in the agreements that said principle of owner, guarantor of this agreement, it was clear that the signature was referring back to the body paragraph defining who was a guarantor. Who should have signed there rather than the two parties who signed on the guarantor? We're not saying they shouldn't have signed it, but to be clear and express, it had to be clear and express in the document that they were signing individually and personally, not on behalf of the only principle of the owner identified in the contract, which is the intermediary LLC. I mean, I follow your argument in terms of what the language is in the body. I'm just not following why or how I'm signing on the line for guarantor when I am indeed not the person meant by the language in the body of the agreement. Do you follow what I'm saying? If I could respond briefly on that. Yeah. The term guarantor on the signature line we would submit has to be read in context of what the guarantor provision of the contract said. And what that said was the principle of the owner is the guarantor. So it's not, we would submit it's not the person who signs the line that's the guarantor. It's who that contract identifies as the principle of the owner. And that's ambiguous. Okay. All right. We'll hear from Chase. Mr. Shular, you know, what the rule is, y'all need the extra six minutes. I'll give it to you. If you don't, get it all done in 20. You can, but just know that I gave you that side, I mean, six to get it all in. If you need it, I'll give it to you. But if you get it done in 20, that's okay. Unless you ask me a whole lot of questions, it's going to be less than 20 minutes. All right. Just wanted to be, you know, even-handed with the. Yes, sir. May it please the court. My name is Wayne Shular. I represent Chase Bank in these proceedings. Mr. Grimsel, who represents Alliance Bank, has ceded his time to me. So perhaps we would not both be being repetitive and beating the same, perhaps, dead horse in these proceedings. Both of our clients were intervened in these proceedings after the seizure of the vessels and thereafter filed summary judgments and were granted same by Judge Hike. We have no argument with Judge Hike's ruling in this proceeding. And, in fact, Judge Zaney followed it up sometime later. I'm not sure if it was the same year, in the Bank of Lafourche-Vizier case, where he basically gives the same type of rulings in a similar agreement. I would say that it's rare that brother-in-laws agree on something, so when they agree on something like this, there must be some very good reasons behind it. And there are, in fact. And the principal reason being that it's going to encourage marine financing of these type of transactions if the bank knows that it can check the records and see whether there is a recorded lien, which is what we do in real estate transactions anyway. My client is not real high on maritime financing at the present time. Chase lent approximately $3.5 million, which it was used to purchase these vehicles from Comar. Alliance lent approximately $1.5 million. If we don't finance the transaction, Comar does not get its money at the closing. These people do not get to purchase the vessel. And just the fact remains that the bank is not going to do the financing if the person sitting across the table from them is going to outrank them two years down the road on an unrecorded claim. And we would submit that that is one of the good policy reasons behind the judge's rulings in that matter. The second one would be that maritime liens should be reserved for third parties who help foster maritime commerce. And in this case, Comar is not making a claim for wages that it fronted on the owner's behalf, and it's not making a claim for fuel or necessaries that allowed this vessel to complete its mission. Comar, in fact, was the one on the mission because they were the ones who were the operators of the vessel. So it's unquestioned good policy. The equities are in favor of the situation, and, of course, we do have the law. And in this case, I think we've already discussed the fact that these liens are not to be – they're strict to our jurisdiction, not to be extended by analogy. I think this is the only area of the law where you can cite a 150-year-old case, and people don't think that you just didn't find a better case than that. But that's just how old these cases are, and that's just how old a bareboat charter is, in fact, where you charter a vessel for a specific voyage or you charter it for a specific time. But the truth of the matter is this is nothing like a charter agreement in a bareboat. I never can say that correctly, bareboat, unless I say it real slow. In this case, the owner is paying the charterer, who is Comar, not the charterer paying the owner. In a bareboat charterer, typically the bareboat charterer pays for the expenses of the voyage. In this case, the owner was paying the expenses. It's also typical in a bareboat charterer that the charterer would indemnify the vessel owner. In this case, the owner is indemnifying the charterer. So in that sense, even if you were to extend it by analogy, it's not a very good analogy in my estimation. The court also went on to hold that even were a maritime lien available, that it would not be available to Comar in these proceedings because of the joint venture doctrine, holding that they were joint ventures with the owners of the vessels. The quote is out of the Cesportes case where it stated those who occupy the position of the owner can't claim a lien. And in this case, it's probably best just to go through the factors rather than the positions set forth in Cesportes. Comar furnished the master and the crews. They marketed and obtained charters. They procured supplies for the vessel. They got land transportation for the crew members. They were maintaining the vessels, certifications for the vessels. They obtained insurance. They selected vendors. And all these things sound like they're the owner of the vessel. And anybody who went up to the vessel certainly would think that it was owned because you're required to paint it Comar colors. You're required to carry the Comar emblem. You're required to carry the Comar satellite system. And I think in that sense, the factors which were set forth in Cesportes of the party's intentions, control, right to control, proprietary interest, sharing of profits and losses are clearly met in this situation. I think one of the arguments that was clearly made in brief was that they're not sharing in the profits and losses.  Well, they clearly are sharing in the profits because the fee was $3,000 a month or 10%, whichever is greater. So they're clearly sharing the profits. And they would make the argument, and I'll save them some time in rebuttal, that, well, they're not sharing in the losses. Well, the fact is that they had money that they had fronted out on this that they ended up trying to collect back from Comar and, of course, trying to collect back from the vessel owners. And in that sense, they were taking a risk that, hey, perhaps the vessel owners might go bankrupt. And guess what? They did go bankrupt. So in that sense, you're certainly altogether taking the same risk. Under the contract between the parties, it's stated clearly that all services were for the account of the owner. They had to maintain an account. It basically was an ongoing relationship between these two parties. I mean, they had accounting going. You can tell probably from the brief I was not at the trial, and Alliance Bank was not at the trial either, but I can tell just from reading it that there was a massive accounting going on on a monthly basis trying to figure out who owed who. And in that sense, this is clearly something where the parties are in a joint venture under the sus portes factors that were in this circuit. I would finally like to bring up one issue that Judge Hyken never did reach, which was an alternate issue, and that was the estoppel issue. And that basically set forth in the Majestic Ventures case, which is cited. But the general proposition is that Comar represented that at the closing, that in the purchase agreements, that these vessels were free and clear of all liens and encumbrances. And then here we are many years later, and they are claiming a lien that outranks the preferred ship mortgages of both Chase and Alliance Mortgage. And the fact is you should be estopped from claiming that you outrank anybody in that situation. And, of course, the alternate argument to that would be, well, there was no breach at the time, and the lien really wasn't there. But the fact is if you had a lien, which you don't, or if you were allowed a lien, if you had a lien, which you don't under the joint venture document, but if you had all that, the fact is that this would have been out there the whole time just waiting for a breach and waiting to say, ha-ha, we now outrank the banks. And in that sense, under any circumstances, they should be estopped from claiming a higher position than the banks in this matter. I think in conclusion I would say that prior to the time that Judge Hike whittled down the claim of Comar in this matter, I mean, basically Comar was claiming that the banks were going to get nothing. They were going to get everything, and they got – of course, I've read the transcript. I've read the judgment. It's been whittled down since that time. But the fact is that there's no way that they should outrank the banks in this matter under either the equities or the law or policy. And I think, of course, we were granted – I don't think anyone has argued that we were granted summary judgments. I don't think anyone has really ever made the argument that there are issues of material fact to be tried at trial of this matter. I don't think that would help resolve anything. I don't think for that matter that anyone has ever contested the validity of the preferred ship mortgages of Chase and Alliance. And in that respect, we would move that the judgment of the district court be affirmed. Do you have a – I'm not sure about all the alignments, but do you have a view or an argument with respect to the lost profits issue and this guarantor issue? No, sir. I mean, I know it doesn't really affect – No, sir. But since the other party ceded, I just want to be sure. Okay. Yes, sir. All right. Thank you, sir. Thank you. Back to you, Mr. Cipriani. To address the maritime lien issue that Mr. Shulaw just addressed first, banks routinely, when they are financing marine transactions, request that their owners, their borrowers, disclose any charters or any agreements that are in place because good banks know that those agreements can give rise to maritime liens if they're breached down the road. And in fact, Chase and Allegiance both had all the documentation from this transaction before they agreed to finance this. So this was fully disclosed to them. And the fact is that at the time that Comar's affiliate sold these vessels to the vessel owners, there were no liens on the vessel. Even though the agreements are entered into, they hadn't been breached, and we certainly had no expectation that they would be. But the law is that once they are breached, the maritime lien that arises from that ranks from the date that the vessels were put in possession of Comar, and that predated the recordation of both Allegiance and Chase's mortgage. When the agreements were disclosed, were they described as bareboat charters? They were provided. So they were provided in text, what they were. And it was up to Chase to determine. In other words, it wasn't a schedule to the agreement that said list all the bareboat charters or anything like one on Schedule 1, and that's where you put this. No, but whenever a bank lends money, they do due diligence and they ask for this information. And they got it. According to the records that were produced by both Allegiance and Chase, they got this. This was in their loan file, so they knew about this. And they saw the provision that said Comar was reserving a maritime lien. So there's no element of surprise here. And the one other point I'd just like to make on lost profits is there's no contradiction in the court's opinion. On the one hand, it said they didn't prove that they lost charter hire. On the other hand, the court said that they did not prove lost profits. They're entitled to recover lost profits, not lost charter hire. And they failed to put on any evidence of those lost profits, which were earned by a completely different operator than Comar. So just extrapolating and moving forward, Comar's performance is not an accurate indication of what their performance would have been with the new operator. All right. Very briefly, Your Honors. First of all, this court's jurisprudence says you extrapolate out from historic performance. That's what the law says. Comar contends that they rank because a bareboat charter ranks. That only doubles down on the analogy issue, which is improper. With respect to the joint venture doctrine, which has kind of been hinted at in the arguments, I just want to point out that the joint venture doctrine is a holistic approach. With all due respect to ducks, if it looks like an owner, walks like an owner, talks like an owner, smells like an owner, it's going to be considered an owner. That's what the law says. That's what Sass-Porte says. So whether one individual factor is or isn't present, and we submit they all are, it doesn't matter. It's a practical, holistic approach. And to go back to the wrongful arrest issue, putting aside all of the bad faith, malicious, lack of probable cause findings of the district court under the contract and based on who would what when, the other kind of overarching thing in this case is they never had a right to a lien in the first place as a matter of law under the joint venture doctrine, which was a well-established, is a well-established doctrine in this court. So that compounds the whole impropriety of their arrest and the lien claims. And also, they say that they say it's a lien in the contract, so it's a lien. That's not the law. You can't just say you have a lien in the contract. That's a condition of law and not of the agreement of the parties. And I'd also point out, Your Honors, again, as a practical matter, they're still claiming a lien to this day, despite the fact that at trial they admitted that the only possibly lienable claims they could have had, i.e., the owner expense claims, ceased to exist once the AR was collected because they owed us $21,000 after it came in. Notwithstanding that, they still continue to claim liens. The payouts for the Chase Finance vessels, which were sold out of the bankruptcy, remain in the registry of the bankruptcy court pending this court's decision. And on top of all that, the vessel parties, our clients, are paying everyone's attorney's fees except Comar. We're paying the bank's fees, both banks, under our loan agreements, and they're also obviously paying our fees. And there's a pending fee dispute in front of Judge Hill, again, waiting this court's decision. The Royal Full Arrest drives this whole thing, and we would submit that. Well, the relief we seek is in our brief, and I don't have time to get through it. Quick question. Just about the lost property issue.  I'm not sure if I'm totally—I mean, that seemed to be a question of whether the district court found the quality of the evidence on that issue sufficient. Tell me again why you say that determination was an error. I didn't hear the last issue. On the lost profits, I mean, as I gathered, the district court denied it. It didn't feel the quality of the evidence or the quality of the presentation was probative in terms of a difference. So just help me understand more succinctly why you're saying that the determination was error. Sure, Your Honor. And I think this actually goes to a standard of review dispute that we have. They say it's clear error because it was a fact finding. We say it's de novo because it was a sufficiency of the evidence issue. There was clear evidence, and I don't have my notes in front of me, but I believe when we put it, it was tab maybe 14 of our record excerpts, charts that Comar created on its own prior to all this blowing up that were submitted in evidence in trial without dispute showing historical utilization rates for all the vessels and historical day rates for all the vessels for a month, two months, three months, four months before. And it's undisputed that the vessels did go to work after they were released from the arrest. They were worked through the bankruptcy proceedings. That's what this court says you need to prove lost profits. You need historic usage, historic utilization. There's tons of cases on that. So the evidence was there, and if you read the court's decision on why he didn't grant it, he's asking, he's saying we should have presented specific lost contracts. You didn't get this contract. That's your damages. That's not what this court's evidentiary requirements are. Okay. You've helped. I was trying to understand where this sort of separated out. Okay. We'll have to look at that and all the other issues closely, to say the least. All right. Thank you, counsel. Thank you, Art. Interesting case, to say the least. This concludes the argument for the cases we have for today. They, along with the not all argued cases, will be submitted. With that, we'll stand in recess until 9 a.m. tomorrow.